## HALE & WARD v. COOK.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1914.)

### No. 2403.

FRAUD (§ 65*)—ACTION FOR DECEIT—INSTRUCTIONS.

Defendants sold and conveyed to plaintiff all the standing ash timber of certain dimensions on certain quarters of sections 33 and 34 of a described township in Fulton county, Ky., "and the fractional sections south of sections 32, 33 and 34." The tracts described, other than the fractional ones, were bounded on the south by what is known as the "Henderson line," run by Henderson in making the original survey of the lands in 1820, and supposed by him to be the state line between Kentucky and Tennessee. The true state line, however, as afterward established, was at this point some distance further south than the Henderson line, leaving land between them which was never sectionalized. There were no fractional sections at this place within the survey. The conveyance further provided that defendants would, as soon as practicable, have the state line, which was not marked opposite the lands, surveyed. Held, in an action by plaintiff to recover damages for misrepresentation as to the quantity of ash timber on the lands, that the words "fractional sections" in the conveyance evidently meant and were intended to include the unsurveyed strip between the Henderson and state lines, and that an instruction which limited the jury to a consideration of the timber on the surveyed lands was erroneous.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 72–74; Dec. Dig. § 65.*]

In Error to the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Action at law by A. D. Cook against Hale & Ward. Judgment for plaintiff, and defendants bring error. Reversed.

For opinion below, see 210 Fed. 340.

W. M. Smith, of Louisville, Ky., W. J. Webb, of Mayfield, Ky., and F. S. Moore, of Hickman, Ky., for plaintiffs in error.

Wheeler & Hughes, of Paducah, Ky., for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. The judgment which this writ of error has brought before us was for the plaintiff. The action was one of deceit, and it was tried to a jury.

On June 29, 1911, Hale & Ward conveyed to Cook "all of the ash timber twelve inches and up at the stump on the following described land in Fulton County, Ky., viz.: The southwest quarter of section 34, T. 1, R. 6 west, and being bounded on the north and west and south by the lands of Hale & Ward and on the east by B. H. Hale's land; also northwest quarter of section 34, the northeast, southeast and southwest of section 33 and the fractional sections south of sections 32, 33 and 34, all in T. 1, R. 6 W., containing about twelve hundred acres, more or less, except 1¼ acres heretofore conveyed as right of way to C. M. & G. R. R. Co." According to this, the land on which the timber conveyed stood consisted of the five quarter sections designated and of the fractional sections south of sections 32, 33, and 34. The first of the quarter sections designated had been conveyed to Hale & Ward by one Williams, and the rest of the land had been so conveyed by R. T. Tyler. Seemingly the latter contained about 1,200 acres, more or less, so that the whole contained about 1,360 acres, more or less. The consideration for the conveyance was $8,000 cash then paid. Cook was given the right for five years after January 1, 1912, with the extension of two years longer, on the payment of $500 additional, to remove the timber. Hale & Ward, on June 26th and 27th previous, had exhibited to Cook, through his agent, the timber they were proposing to sell him.

The misrepresentation complained of was as to the quantity and quality of the ash timber conveyed. It was that the ash timber conveyed was the timber theretofore exhibited, and that there was of it 2,000,000 feet that was merchantable. It was not controverted that it had been represented that the timber conveyed was the timber theretofore exhibited. The position was simply that the representation was not untrue. It was controverted that it had been represented that there was on the land 2,000,000 feet of such timber that was merchantable, and possibly also that such a representation would have been untrue. The questions so raised and that as to the amount of recovery were the sole questions in the case. The verdict and judgment was for $8,000, the exact amount which had been paid.

Of the errors assigned the only one urged in argument is a portion of the charge to the jury on the subject of the amount of recovery, which is the only part of the charge excepted to, and we will limit what we have to say thereto. The jury had been told that the measure of damages was "the difference between $8,000 paid by the plaintiff and the value of the ash timber on the land described in the contract, of the dimensions and character provided for therein, estimated proportionately; that is to say, as $8,000 is to the value of the ash timber of that description now actually on the land described in that contract and that which may be there by January 1, 1917." They were then charged as follows, to wit:

"And the court in this connection particularly charges you that, in estimating the ash timber for this purpose, you should only estimate what is now on or by January 1, 1917, may be on the sections and quarter or other frac-

tional sections mentioned in the contract. Timber upon any other land was not sold to plaintiff or conveyed to him. In this connection, and, in making your estimates, should you find for the plaintiff on the other issues, then you should remember the uncontradicted testimony that only the land north of what was called in the testimony the Henderson line was ever sectionized. In ascertaining plaintiff's damages, should you find for him, you should not take into consideration any timber on land not embraced in the sections and quarter or other fractional sections mentioned in the contract, for only that timber was conveyed to the plaintiff, and only that timber became his property. Ash timber not on the sections and fractional sections described in the contract should not be embraced in your estimate, even should it be in Fulton county, Ky., south of the sections and fractional sections referred to."

It is this portion of the charge which was excepted to and that has been assigned as error. We are constrained to hold that the assignment is well taken. To make this plain necessitates that we make a statement of facts in addition to those already set forth, going considerably into detail, and that we make certain ultimate deductions therefrom. In so doing we will state such facts only as are unquestionable, appearing either from the evidence or from public documents of which we take judicial notice.

Fulton county, in which the land on which the timber conveyed stands, is the most southwest of the counties of Kentucky. It binds on the Mississippi river and the state of Tennessee. The county of that state on which it binds is Obion. Within it is situated Reelfoot Lake, of some notoriety. Arms thereof extend north across the state line into Fulton county. The eastern arm is known as Green timber or Grassy, and the western one as Eastage. Between the two are three smaller ones. The line between the two states, referred to in an early act of the Legislature of Kentucky as the "chartered line of Kentucky," was the parallel 36° 30' of north latitude, a due east and west line. Article 1, ch. 12, of Kentucky Statutes (4th or 1909 Ed.), the third or 1903 edition of which was adopted by an act of the Legislature approved February 29, 1904, gives an historical sketch of the manner in which the boundary of Kentucky was formed and finally fixed. It contains this as to the line between the states of Kentucky and Tennessee:

"The line which divided Virginia and North Carolina was the southern boundary of the state of Kentucky. Virginia and North Carolina, prior to the creation of the states of Kentucky and Tennessee, appointed commissioners, Messrs. Walker and Henderson, to run and mark the line on the parallel of latitude 36° 30'. From a point on the top of the Cumberland Mountains, now the southeastern corner of the state of Kentucky, the commissioners, jointly, did not run the line west. One of the commissioners (Mr. Walker) run and marked the line to a point on the Tennessee river. This line, called Walker's line, was regarded for many years as the dividing line between the states of Kentucky and Tennessee. It was ascertained, however, that the line, as run and marked by Walker, was north of latitude 36° 30'. After the Indian title to the land west of the Tennessee river was extinguished by the treaty of 1819, the Legislature of Kentucky appointed Robert Alexander and Luke Munsell to ascertain the true point of latitude 36° 30' on the Mississippi river and to run and mark a line east upon that parallel. This was done so far east as the Tennessee river. The two states subsequently appointed commissioners, vested with full powers, to settle and adjust all matters concerning the boundary between them. The commissioners entered into an agreement, which was subsequently ratified by the Legislatures of the two states, and the line

therein described has been ever since the southern boundary of the state of Kentucky."

The ratification by the Legislature of Kentucky of the agreement referred to was by an act of February 11, 1820, which is incorporated in article 3 of that chapter. We are here concerned with only so much of the state line as is west of the Tennessee river. By the agreement the line was to run with Walker's line to the Tennessee river and "thence with and up said river (i. e., south) to the point where the line of Alexander and Munsell, run by them in the last year (i. e., 1819), under the authority of an act of the Legislature of Kentucky, entitled 'An act to run the boundary line between this state and the state of Tennessee, west of the Tennessee river,' approved February 8, 1819, would cross said river and thence with the said line of Alexander and Munsell to the termination thereof on the Mississippi river below New Madrid."

By this article 3, after reciting the act of February 11, 1820, it is declared what the southern boundary of the state is, and, as to that portion thereof west of the Tennessee river, the declaration is that it runs "thence with the line run by Alexander and Munsell on the parallel of latitude 36° 30′ to the middle of the channel of the Mississippi river opposite the point on the Mississippi below New Madrid, fixed, marked and ascertained by them as the point of intersection of said parallel of latitude and said river."

This historical sketch and this declaration in this form first made their appearance in the Revised Statutes of Kentucky adopted in 1851 and 1852. They were carried thence into the General Statutes of Kentucky adopted in 1873. The act of February 11, 1820, was then for the first time incorporated therewith, and the matter as thus presented was carried into the Kentucky Statutes now in force.

The sketch is both incorrect and incomplete. Alexander and Munsell did not run and mark the entire line from the Tennessee river to the Mississippi. Nor, in so far as they ran and marked it, did they proceed from the Mississippi river and run east. That this is so will appear later. The sketch was complete when first made (i. e., at the adoption of the Revised Statutes in 1851 and 1852), but not so when carried into the General Statutes, adopted in 1873. In the meantime, in the late '50's, the two states took most important action in relation to the line between them. An act of the Legislature of Kentucky, entitled "An act for running the state line between Kentucky and Tennessee," was approved February 17, 1858. Session Acts 1857–58, vol. 1, p. 82. By that act provision was made for the appointment of two commissioners to act in conjunction with such as might be appointed by the state of Tennessee "to run and re-mark the line between the states of Tennessee and Kentucky, beginning on the east bank of the Mississippi river, running thence to the eastern boundary of the state of Kentucky, putting up a large stone every five miles, provided when rock or stone cannot be conveniently had, posts of some durable wood be substituted." The commissioners were to report to the Governor what they did in the premises, and he was to communicate their report to the succeeding Legislature of the state. With their report they were to submit "a plat of their survey showing the relative positions of for-

mer lines to the line of survey made by them and such other information as may be necessary." Pursuant thereto and to like legislation on the part of Tennessee, the entire line was run and re-marked in the year 1859, and the report of the joint commissioners submitted to the Governor of Kentucky was communicated by him to the Legislature of 1859–60. This report with accompanying plat is to be found in a book entitled "Documents 1859–60," containing legislative documents of that year. And by an act of the Legislature of Kentucky entitled "An act relating to the dividing line between the states of Kentucky and Tennessee and allowing compensation to the persons engaged in running the same," approved February 28, 1860 (Session Acts, 1859–60, vol. 1, p. 71), it was enacted that "the boundary line recently run and made between the states of Kentucky and Tennessee by commissioners respectively appointed by said states be, and the same is hereby approved, adopted and recognized as the true boundary line, between said states"; and provision was made for the deposit of two printed copies of the report of the commissioners and a lithograph map of the survey in the clerk's office of each county in the state on the state line of Kentucky and Tennessee. A like report was made to Tennessee, and approved by its Legislature, and the line as thus run and marked is set forth in full in Shannon's Annotated Code of Tennessee, published in 1896, p. 125 et seq.

No notice of this action is taken in the General Statutes of Kentucky or the Kentucky Statutes, except that Judge Carroll, editor of Kentucky Statutes, in a note to article 3 of chapter 12 thereof, after directing attention to the legislation, says:

"For reasons unknown to me, the boundary as run by these commissioners was omitted from the General Statutes, and I have not deemed it necessary to insert it in this statute, nor do I know to what extent, if any, it varies from the boundary here inserted, which is the boundary found in the edition of the General Statutes adopted as the law of the state in 1873."

The true explanation of its omission from the General Statutes would seem to be that it was simply overlooked. The relation of this boundary to the earlier boundary run by Alexander and Munsell is to be gathered from the report of the commissioners who made it. But, before noting what they say in regard thereto, attention should be directed to another matter in connection with the portion of Kentucky west of the Tennessee river. The portion of the state east of that river has never been laid off into townships and sections. Provision for so laying off that portion thereof west of the Tennessee river was made by an act of the Legislature, entitled "An act to provide for laying off the lands west of the Tennessee river into townships and sections," approved February 14, 1820. 2 M. & B. p. 1040. It called for the appointment of a superintendent to do the surveying, and provided that first the land should be divided into townships six miles square "by north and south lines running according to the true meridian, and by others crossing them at right angles," except "where the course of navigable rivers" might "render it impracticable," and in such case the rule should "be departed from no farther than such particular circumstance" might "require," and that then each township "should be divided into sections containing, as nearly as may be, 640 acres each,

by running through the same 5 lines parallel to the east boundary lines of the township beginning at the distance of one mile from each other," which with 5 lines run through it parallel to the south boundary lines, so beginning, contemplated by the act, but not expressly called for, would make 36 sections to the township. Provision was made for numbering and marking the townships and sections and also for marking quarter sections. William T. Henderson was appointed superintendent under this act, and he completed the work in 1821. By an act approved December 19, 1820, he was given the exclusive right for 10 years to publish and sell a map of his work.

We return now to note the relation of the line run in 1859 to that run in 1819, and we will confine ourselves to the portion thereof west of the Tennessee river. It is from the report of the commissioners who ran and marked the line in 1859 that we gather that the historical sketch hereinbefore referred to is incorrect in the particulars stated and just what Alexander and Munsell did in 1819. These commissioners state that they (i. e., Alexander and Munsell) ran west from the Tennessee river. They "intended and believed" the line which they ran therefrom to be "on the parallel of 36° 30' north latitude." But they missed it. The point which they took to be in that latitude at the river was in fact upon the parallel of 36° 29' 54"; i. e., "too far south by 600 feet." They started their surveyors therefrom westward and themselves floated down the Tennessee, Ohio, and Mississippi rivers to a point something over two miles above the head of island No. 10 in the Mississippi, which they determined to be in the right latitude, there to await the coming of the surveyors. They in their westward course "tended northward," and that so much so that when they reached the Green timber arm (i. e., the eastern arm of Reelfoot Lake, a distance of some 68 miles) they were north of their starting point about 3,600 feet and of the latitudinal line about 3,000 feet. As to what they did when they reached this point the commissioners have this to say:

"They concluded that these arms of the lake, swamps, ponds, and bayous were impassable—and no wonder. Nothing like them are to be seen in either state, unless it be southwardly; the country was sparsely populated; the Indian title to the lands but recently extinguished by the treaty of Jackson and Shelby, and they about being brought into the market. None but old pioneers, or those who always march in advance of civilization, knew anything about it. They went around all these apparent obstructions to the Mississippi river, where the state line going west first crosses it, and here they met the commissioners."

The point on the east bank of the Mississippi river which was determined to be in the proper latitudinal line was correct. The commissioners say that it "coincided with ours very nearly." Owing to the Mississippi river at this point being somewhat in the shape of the letter "S" reversed, looking west, a portion of Fulton county (i. e., the portion in what is known as the Madrid bend) is west of a portion of the state of Missouri, which thus intervenes between the two portions of Fulton county, and there are two east banks of the Mississippi river therein. The point at which the commissioners awaited the surveyors and the surveyors met them and was determined to be the proper latitudinal line was the near east bank of the river. From this point "the

surveyors were started back with the view of striking the lake on its western shore opposite to the point where they had been stopped by it on the other; but after running 274 poles, encountering a pond and heavy canebrake, they again stopped short of the western shore of the lake near three miles and short of where they had stopped on the other over five." This portion of the line they ran practically on the latitudinal line. From the end of this 274 poles they ran no further eastward. It follows that Alexander and Munsell, in running the line in 1819, did not run so much thereof as intervened between the point on the east side of the Green timber or eastern arm of the lake where the surveyors stopped in their westward course, and the point 274 poles from the near east bank of the Mississippi river, and near three miles short of the western shore of the lake. The 1859 commissioners thus express themselves as to this:

"They neither run or marked this portion of the line, but left it as they found it—untouched—not supposing, as we are willing to believe, that they were more than half a mile south of their stopping place on the other side."

The portion of the line which was not run is the portion thereof which crosses the arms of Reelfoot Lake, hereinbefore referred to.

The surveyors in 1819 not only tended northward in their westward course from the Tennessee river to the Green timber or eastern arm of the lake, but made "angles almost continually, though small ones."

"To run any half mile of their whole line, and then produce it each way for half a mile, neither of the last would have followed the course of the first in more than one or two instances."

The 1859 commissioners in their report cover also what Henderson did as to the state line in 1821, when engaged in laying off the land into townships and sections. They state that he "run the same line (i. e., as Alexander and Munsell) from the Tennessee river to the Green timber arm of Reelfoot Lake, and then produced it to the Mississippi river on the parallel of 36° 30' 32" of north latitude, or 3,200 feet or thereabouts north of the true point. This he made his base line in sectionizing the lands south and west of the Tennessee river."

This disposes of the work of Alexander and Munsell and of Henderson, as disclosed by this report. What, then, according thereto, did those commissioners do? They simply accepted the work of Alexander and Munsell, so far as it went, except that they "endeavored to straighten" the line from the Tennessee river to the Green timber or eastern arm of the lake "somewhat by making points at each quarter section corner (that is, every half mile nearly) and connecting these points by direct lines." This left the eastern end of the 274-pole line west of Reelfoot Lake still "more than half a mile south" of the western end of the 68-mile line east of the lake. Beyond thus correcting the latter and marking both, the commissioners did no more than to connect the ends of the two lines run in 1819 by a straight line, the course of which going east was N. 83° 40' 19" E. They say as to this that they "run the line across Reelfoot Lake, and the swamps, ponds, and bayous adjacent thereto, and marked it all the way (a work never performed before); and we were about four weeks engaged in it."

The statute, as herebefore noted, required the commissioners to place stone posts every five miles. As they ran eastward from the Missis-

sippi, the stones which they placed were numbered from one up. These stones they had specially prepared for the purpose at Bowling Green. They did not place the first stone at the end of five miles, because by reason of the Madrid Bend of the Mississippi river, hereinbefore referred to, it would be in Missouri, but placed it at a distance of ten miles from the western end of the line or starting point (i. e., the far east bank of the river), and then placed them "every succeeding five miles or nearly so—sometimes falling short, and again going over somewhat in order to get places where persons would have an opportunity of seeing and knowing where the state line was, instead of placing them precisely five miles apart, in out-of-the-way places on mountain tops, in deep ravines, or in cultivated fields, where but few, if any, persons would be likely ever to see them." They had engraved on them on appropriate sides "Ky." and "Tenn.," their number and their distance in miles from the starting point. They also placed a stone at the end of the 274 poles from the near east bank of the Mississippi, engraving upon it the course to the stopping point on the eastern shore of the lake, to wit: "N. 83° 40' 19" E."

The No. 1 stone, heretofore referred to, placed ten miles from the western end or starting point of the line, was "put in the ground 319 feet west of the western shore of the Eastage, or western arm of Reelfoot Lake." The No. 2 stone was placed some distance east of the Green timber or eastern arm of the lake, and they placed at the end of the 68-mile line run by Alexander and Munsell in 1819 and re-run and marked by them (i. e., at the point where that line joins the line which they ran across the arms of Reelfoot lake to connect it with the eastern end of the 274-pole line) a mulberry post. We are not concerned with the stones east of No. 2, and hence take no notice of them. The only monuments of which note need be taken are the four already mentioned, to wit: (1) The stone at the end of the 274 pole line, also, referred to as a "set rock"; (2) stone No. 1 at the end of ten miles from the starting point (i. e., far east bank of the Mississippi river) and 319 feet west of the western shore of the Eastage or western arm of Reelfoot Lake; (3) the mulberry post on the eastern shore of Green timber or eastern arm of the lake; and (4) stone No. 2 (east of eastern arm of lake). The stone or set rock at the end of the 274-pole line is referred to in the evidence as Brushy Point Rock; stone No. 1 as Tyler Rock; and stone No. 2 as Puckett Rock. These monuments are now all standing and where the commissioners placed them in 1859. One witness for Cook testified that the Tyler Rock had been moved south a considerable distance from where he had before known it to be, but other testimony is strongly against this and to the effect that it is now where it has always been, and Cook has no interest in questioning this and maintaining the correctness of his witness' testimony. The mulberry post is not now standing, nor does it seem that there is any indication on the ground where it once stood or that any witness recollects ever having seen it. The commissioners in their report gave the courses between the monuments erected by them, but not the distances. These, however, can be obtained from their map. The courses from the near east bank of the Mississippi river to stone No. 2, or Puckett Rock, are as follows, to wit:

"Beginning on the east bank of the Mississippi river at station 35 + 363, in latitude 36° 30′ 00.29″, and running S. 89° 35′ 15″ E., passing a set rock at station 35 + 877, to a second set rock at station 40 + 055 (i. e., Brushy Point Rock at end of 274-pole line), thence N. 83° 40′ 19″ E., passing stone No. 1 (i. e., Tyler Rock) at Station 52 + 800 to station 66 + 751, a mulberry post (now gone); thence S. 88° 35′ 14″ E. to stone No. 2″ (i. e., Puckett Rock).

As a further aid to a comprehension of the situation with which we have to do, we here give the first two sheets of the map prepared by the commissioners and accompanying their report.  They are as follows, to wit:

Notwithstanding the care and thoroughness with which the commissioners did their work, they made two mistakes in the portion of the line with which we have to do. There is another mistake in the report which they made to the Governor of Kentucky as copied in "Documents 1859–60," but possibly that was a mistake of the printer. Therein the course from the mulberry post to stone No. 2, or Puckett

Rock, is given as S. 83° 35' E. It should have been S. 88° 35' 14" E. It is so given in the Tennessee Code. That this is the correct course rather than the other is shown by the map. It shows that the course of the line from the mulberry post to stone No. 2, or Puckett Rock, is that of the line east of the latter monument, and both of the reports give the courses therefrom as "S. 88° 57' 40" E."; "S. 88° 05' E."; "S. 88° 10' E.," etc.—which conform substantially to the course from the mulberry post to that monument as given by the Tennessee Code, to wit, S. 88° 35' 14" E. The two mistakes which the commissioners made were in relation to the placing of the stone or set rock at the end of the 274-pole line, to wit, Brushy Point Rock, and stone No. 1, or Tyler Rock. They placed the latter where the former should have been placed and the former at the end of 10 miles from the starting point; i. e., far east bank of the river. This is shown by the uncontradicted evidence that "No. 1" is marked on the stone or set rock at the end of the 274-pole line, and that on the stone 10 miles from the starting point (i. e., far east bank of the river) is marked on the north side "83° 40' 19" " and on the south side "89° 35'." These are the courses according to the report from and to the end of the 274-pole line—that therefrom being "N. 83° 40' 19" E.," and that thereto being "S. 89° 35' 15" E." The other mistake was in placing any stone at all where they misplaced the stone intended for the end of the 274-pole line; i. e., at the end of the 10 miles from the starting point or where the Tyler Rock stands. The uncontradicted evidence is that the stone so placed and bearing on its north and south sides the figures "83° 40' 19" " and "89° 35'," respectively, is 794 feet south of a line running from the Brushy Point Rock at the end of the 274-pole line N. 83° 40' 19" E. to the mulberry post (i. e., the place where it once stood), which is the course given between those two points. There is but one line between those two points, and that, of course, is a straight line. As heretofore stated, all the 1859 commissioners did was to re-run and mark the line so far as run in 1819 and then to connect the ends of the two lines then run by a straight line. In both the boundary given in the report made to the Governor of Kentucky and that given in the Tennessee Code, these two points are connected by one straight line, the course of which going east is given as N. 83° 40' 19" E., and it is stated that in its course that line passes stone No. 1. In the report to the Governor of Kentucky it is stated that the stone or set rock at the end of the 274-pole line (i. e., the Brushy Point Rock) had engraved on it "the course to the stopping point on the eastern shore of the lake, to wit, N. 83° 40' 19" E." Besides the map shows but one straight line between the two points. Whereas, if the stone intended for stone No. 1 and known as Tyler Rock was rightly placed, it takes two lines to connect those two points. And it would seem to be apparent just how the mistake came to be made. As stated, that monument was placed 10 miles from the starting point; i. e., far east bank of the Mississippi. The course from that point to the west bank thereof is S. 89° 15' 18" E., and that from the near east bank thereof to the end of the 274-pole line, Brushy Point Rock, is S. 89° 35' 15". The two courses are practically the same. What the commissioners did in measuring

the 10 miles was to continue this same course to the end of the 10 miles, instead of changing their course northwards from the Brushy Point Rock onwards. At least this is a very plausible explanation of their certain mistake.

This concludes the statement of facts which we have deemed it necessary to put forth to make plain our position as to the assignment of error in question. The ultimate findings which we would reach therefrom are three.

1. That the line between the two states from Brushy Point Rock on the west to Puckett Rock on the east, consists of two straight lines which are as follows, to wit: From the Brushy Point Rock N. 83° 40' 19" E. to the mulberry post and from the latter S. 88° 35' 14" E. to Puckett Rock. Of course, as the mulberry post is not now standing, it has to be located. If its location can be proven, such will have to be taken as its position. Otherwise it is that point on the eastern shore of Green timber or eastern arm of Reelfoot Lake where a line from Brushy Point Rock running N. 83° 40' 19" E. will strike a line from Puckett Rock running N. 88° 35' 14" W. But, assuming the location thereof to be determined, a straight line from it to Puckett Rock on the east and another such line from it to Brushy Point Rock on the west constitute the line between the two states at this point.

We do not think that the matter is affected by the consideration that, subsequent to the fixing of such as the state line by the legislation of the two states in 1858 and 1860, the Legislature of Kentucky by adopting the General Statutes of 1873 and the Kentucky Statutes in 1904, whereby it was declared that the line between the two states west of the Tennessee river should be "the line run by Alexander and Munsell on the parallel of latitude 36° 30'." As stated, they did not run the whole line. They ran the 68-mile line on the east of Reelfoot Lake, but not on the parallel and the 274-pole line on the west thereof on the parallel. As coming within the purview of the legislation, a straight line connecting the ends of these two lines should be taken as being so far the state line. Thus construing this legislation, the line is the same as that adopted in 1858 and 1860.

2. That so much of Fulton county as lies within the line from the mulberry post to Brushy Point Rock and thence to the near east bank of the Mississippi river (i. e., the state line on the south) and the line from the mulberry post on the parallel 36° 30' 32" to the near east bank of that river, the line which Henderson in 1821 produced from the western end of the 68-mile line run by Alexander and Munsell in 1819, on the north, starting from nothing and widening as far as Brushy Point Rock was not sectionized by Henderson and has never been sectionized. He did not sectionize it because he thought that it was in the state of Tennessee.

3. That there are no fractional sections binding on the Henderson line, but the whole sections come down to it. This may not be so clear and certain as the other two ultimate facts which we have found. But we think that there can be no reasonable doubt that this is so. According to the report of the 1859 commissioners, Henderson took the line run by Alexander and Munsell and the production thereof by him

to the Mississippi river on parallel 36° 30′ 32″ north latitude as "his base line in sectionizing the lands south and west of the Tennessee river." In the absence of this statement, it would be taken that he did this. There was no other line for him to take as a base line, as all the other sides of the land were bounded by the three rivers, Tennessee, Ohio, and Mississippi. This line was taken to be a due east and west line, and the township and sectional squares which he made were bounded by north, east, south, and west lines. There was therefore no occasion for him to locate any fractional sections binding on what he took to be the state line, so far as it had been run by Alexander and Munsell. That the whole sections come down to and bind on the state line, as he took it to be, may be inferred from the statement of the 1859 commissioners, heretofore quoted, that, in endeavoring to straighten out the 68-mile line run by Alexander and Munsell, they made "points at each quarter section's corner (that is, every half mile nearly") and connected "these points by direct lines." Besides it is a fact familiar to all those acquainted with this survey system and developable from the requirement in the statute of 1820 that the work should begin at the southeast corner of each township; that all fractional sections resulting from surveying discrepancies are necessarily upon the north and west edges of a township; and that it is therefore impossible that there should be any fractional sections between 32, 33, and 34, and the base line of the survey being the south line of the township. Two reasons are urged on behalf of Cook, whose interest it is thought to be to have it that there were fractional sections binding on the Henderson line, why it should not be held otherwise. One is that a line whose latitude is 36° 30′ could not possibly be taken as a base line for a section, because such a line runs between an east and west course and a north and south course, and the sections run directly north and south and east and west. But the mistake is made in thinking that such a line so runs. It does not so run. It runs a due east and west course, and hence can be taken as a base line for a section. It is stated by the 1859 commissioners that Henderson took the state line, as run by Alexander and Munsell and produced by him, as the base line in his sectionizing. The other reason so urged is the absence from the record before us of certain documentary evidence introduced before the jury, consisting of a plat of the land on which the timber conveyed stood, given by Hale to Cook's agent when the land was exhibited to him, two maps made by surveyors, who testified, and the report of the 1859 commissioners. But this report, if it was the full report, as contained in "Documents 1859–60," which we doubt, favors, as we have seen, the position that there were no fractional sections binding on the Henderson line. It certainly contained nothing tending to show that there are such sections. As to the surveyor's maps, we gather from their testimony in connection with them that they were limited to showing the respective contentions as to the state line and did not indicate anything as to the nature of the sections binding on the Henderson line. And there is no reason to believe that the plat given by Hale to Cook's agent contained any such indication. We are quite confident that, with what we have before us, we are in as good a position as the

lower court to determine this matter. Besides what we have urged in support of the position here taken, there are slight indications in the testimony of the surveyors introduced by Cook that they thought it was whole and not fractional sections which bounded on the Henderson line, but it is not necessary to lengthen this opinion further by referring to them. We would note that one of the maps which Henderson was authorized to publish and sell was not introduced in evidence. Possibly no such maps are now in existence.

These findings enable us to come closer to the question in hand. The land on which the timber conveyed stands lies north of Reelfoot Lake and binds to a certain extent on its arms which extend across the state line into Fulton county. The parties understood that it extended down to the state line. When the timber was exhibited it was so represented, and the conveyance contained the following clause, to wit:

"It is also agreed by parties of the first part (i. e., Hale & Ward) that they will, as soon as practical, not, however, to be longer than November 1st, 1911, have the state line between said land in Fulton county, Kentucky, surveyed."

There is an ellipsis here of the other land between which and that described here, referred to as "said land in Fulton county, Kentucky," the state line was thought to run. It was the land across the state line in Obion county, Tenn. This thought and the provision that this line should be run makes certain that the parties understood that the land on which the timber stood and the timber itself so extended. There is no indication in the evidence that at the trial they differed as to this. The sole difference in this particular which it discloses is as to the location of that line. And, in view of the findings we have made, there can be no doubt that it extended thereto. The whole sections mentioned in the conveyance, to wit, 32, 33, and 34 of township 1, range 6 west, the quarter sections designated being in sections 33 and 34, are the lower tier of sections in that township and extend from west to east. This is to be gathered from the fact that the sectionizing act provided that the sections should be "numbered respectively, beginning with the number 1, in the northeast section of the township and proceeding west and east alternately through the townships with progressive numbers until the thirty-sixth shall be completed." These sections, therefore, bind on the Henderson line. But the conveyance is not limited to the timber on the quarter sections designated in sections 33 and 34. It covers also the timber "on the fractional sections south of sections 32, 33 and 34." It was not possible for these words to have had any application except to the timber on the land between the Henderson line and the state line. Of course, were it a fact that there are fractional sections between the whole sections 32, 33, and 34 and the Henderson line, then probably the timber conveyed should be limited to that line. In such a case, the words of the conveyance as to fractional sections could have application without going to the state line. But, as there are no such fractional sections, those words can only have application to the land between the Henderson line and the state line, and they must therefore be held to have been intended to and that they did cover that land. Cyc. vol. 13, pp. 543, 544, and 545.

It follows that Hale & Ward were entitled to have the jury charged that the conveyance conveyed all the timber down to the state line, and that, in making an estimate of the value of the timber conveyed in determining the difference between the consideration paid and such value, they should include all of such timber. They were also entitled to have the jury charged that the state line was located as hereinbefore held. No such charge on either point was requested by them. Nor was any such charge given by the court of its own motion. Instead it left it to the jury to determine the extent of the timber. It told them that they were to estimate the timber on the sections and quarter or other fractional sections in the contract and upon no other land. In so far there was no error, save possibly in leaving the question to the jury, of which possibly, in view of the fact that the court was not requested to charge that the land and timber on it extended to the state line and that that line was located as held herein, Hale & Ward could not complain. But the court did not stop here. It, with emphasis, directed the jury's attention to the "uncontradicted testimony that only the land north of what was called in the testimony the Henderson line was ever sectionized," and further on charged them that they should not embrace in their estimate ash timber not on the sections and fractional sections described in the contract, "even should it be in Fulton county, Ky., south of the sections and fractional sections referred to." There was no timber in Fulton county, Ky., south of those sections and fractional sections. The timber thereon, as we have seen, extended down to the state line. The jury were thus charged that they might limit their estimate of the timber conveyed to that north of the Henderson line, if they determined it extended no farther south, notwithstanding that by so doing no effect whatever would be given to the words in the conveyance as to the fractional sections south of sections 32, 33, and 34. Such, then, are our reasons for holding that the lower court erred in so charging the jury. It should be noted that it had to deal with a very complicated situation and was probably without the help of the full report of the 1859 commissioners which sheds so much light on it.

The judgment is reversed and cause remanded for further proceedings consistent herewith.